

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-16-2005

# In Re: Gen Datacomm

Precedential or Non-Precedential: Precedential

Docket No. 04-1710

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

## Recommended Citation

"In Re: Gen Datacomm " (2005). *2005 Decisions.* Paper 1094.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1094

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 04-1710
_____

IN RE: GENERAL DATACOMM INDUSTRIES, INC.,
Debtor

_____

GENERAL DATACOMM INDUSTRIES, INC.,
Appellant

v.

JAMES R. ARCARA, FREDERICK R. CRONIN,
ROBERT S. SMITH, and THOMAS L. THOMPSON


DAVID BUCHBINDER,
Trustee

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 02-cv-01373)
District Judge: Honorable Kent A. Jordan
_____

-1-

Argued: December 15, 2004

_____

BEFORE: NYGAARD and GARTH, <u>Circuit</u> <u>Judges</u>
and POLLAK[*], <u>District</u> <u>Judge</u>.

( Filed: May 16, 2005)

_____

OPINION

_____

Joseph A. Malfitano, Esq.
Joel A. Waite, Esq.
Michael R. Nestor, Esq.
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

John B. Sherman, Esq. (Argued)
Weisman Celler Spett & Modlin, P.C.
445 Park Avenue, 15th Floor
New York, New York 10022

<u>Counsel for Appellant</u>

Eric G. Waxman III, Esq.
Daniel M. Kolko, Esq. (Argued)

_____

[*] Honorable Louis H. Pollak, District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Phillips Nizer LLP
600 Old Country Road, Suite 241
Garden City, New York 11530

Christopher S. Sontchi, Esq.
Ricardo Palacio, Esq.
Ashby & Geddes
222 Delaware Avenue, 17ᵗʰ Floor
P.O. Box 1150
Wilmington, Delaware 19899

Counsel for Appellees

GARTH, Circuit Judge:

Both the Bankruptcy and District Courts here held that Appellees James R. Arcara, Frederick R. Cronin, Robert S. Smith and Thomas L. Thompson (collectively, the "Appellees") – former long-term senior executives of Appellant General Datacomm Industries Inc. and its affiliates ("DataComm") – were "retired employees" within the meaning of 11 U.S.C. § 1114 and were therefore entitled to their retiree benefits. Section 1114 of the United States Bankruptcy Code ("Bankruptcy Code") affords certain procedural protections to "retired employees" of Chapter 11 debtors. *See* 11 U.S.C. § 1114(a), (e). When applicable, these procedural protections are held to override the provisions of 11 U.S.C. § 365, which generally allow a debtor in possession, subject to the court's approval, to reject any executory contract of the debtor in order to relieve the estate of onerous and burdensome future obligations. *See* 11 U.S.C. § 365(a).

The questions presented in this appeal are: (1) whether the term "retired employees," as contemplated by § 1114,

encompasses the concept of "forced retirement," at least in situations where, as here, employees on the verge of voluntary retirement are strategically and deliberately terminated without cause by a debtor; and (2) if so, may DataComm's executory agreement providing benefits for retirees be rejected pursuant to 11 U.S.C. § 365. As stated, both courts rejected DataComm's attempt to terminate or otherwise modify the Appellees' retiree benefits without first complying with the mandates and procedural requirements of § 1114.

We hold that involuntary termination of employees on the verge of retirement cannot deprive such employees of the procedural protections of § 1114. Accordingly, the District Court did not err in affirming the Bankruptcy Court's order, which denied rejection of DataComm's agreement to provide such benefits.

I.

A.

The material facts on appeal are not in dispute. On or about September 4, 1997, the Board of Directors of DataComm approved a "Benefit Agreement for Long Term Senior Executive Officers and Other Senior Level Employees" (the "Benefit Plan"). DataComm originally entered into the Benefit Plan with Appellees Arcara, Cronin, and Smith. Thompson, the remaining Appellee, was added as an Eligible Executive[1]

---

[1] Eligible Executives included the individuals designated in the Benefit Plan (*i.e.*, Arcara, Cronin, Johnson), as well as any other senior corporate officer elected to the office of Senior Vice President or any higher office, and any other senior level employee of DataComm designated by the Board of Directors as an Eligible Executive who had been employed by the

-4-

subsequent to the establishment of the Benefit Plan.

The Benefit Plan provided for two discrete forms of benefits. First, DataComm was required to pay the annual premiums of up to $7,000 for Long Term Care insurance coverage for the lifetime of each Eligible Executive and his spouse ("Long Term Care Benefits").[2] Second, the Benefit Plan also provided that, upon retirement, each Eligible Executive and his spouse would receive, at DataComm's sole cost, a lifetime continuation of the health insurance benefits that DataComm was then furnishing to the Eligible Executive ("Retirement Health Benefits").[3]

---

company for more than 25 years, and was 60 years of age or older. Benefit Plan ¶ 2(a).

[2] "Long Term Care: Effective upon approval by the Board of Directors of this Plan, the Corporation shall pay the annual premiums of up to an annual maximum amount of $7,000 (the 'cap'), for Long Term Care insurance coverage in the amount specified in Schedule A to the Plan, for each Eligible Executive and his or her spouse for the remainder of their respective lives." Benefit Plan ¶ 3.

As more fully explained in note 13 *infra*, DataComm has waived the argument that the Long Term Care Benefits are not "retiree benefits" within the meaning of § 1114. Thus, while the issue has been raised in this appeal, we neither consider nor decide it here.

[3] "Retirement Health Benefits: Upon an Eligible Executive's retirement, the Eligible Executive and his or her spouse shall thereafter receive for the remainder of the lives of the Eligible Executive and his or her spouse, a continuation of the health insurance benefits the Corporation was then furnishing the Eligible Executive, at the Corporation's sole

-5-

The Benefit Plan listed at least five actions which, if taken by Eligible Executives, would lead to discharge and loss of all benefits. It essentially provided that DataComm, in its sole judgment, could effectively terminate all benefits thereunder if, among other things, the Eligible Executive violated any confidentiality agreement; disclosed any proprietary information; refused cooperation with DataComm in litigation; directly or indirectly became employed by, or purchased stock of a competitor; brought suit against DataComm (except as to claims relating to the Benefit Plan); or disparaged the company. Benefit Plan ¶ 6.[4] Aside from the grounds for terminating

cost." Benefit Plan ¶ 4.

[4] Paragraph 6 provides:

In the event in the sole judgment of the Board of Directors of the Corporation, an Eligible Executive or his or her spouse directly or indirectly, (i) becomes employed by or performs consulting or other services to, or becomes a director of, or makes or retains any investment in or loan to, a competitor of the Corporation (*provided* the foregoing shall not be deemed a breach if the eligible executive was unaware such entity was a competitor *provided* he or she promptly divests himself or herself of any such investment upon learning of such event and *further provided* the foregoing shall not apply to an investment in securities listed on a national securities exchange or NASDAQ where the aggregate investment is less than $10,000), or, (ii) violates any confidentiality or similar agreement with the Corporation or discloses or uses any confidential or proprietary information of the

benefits specified in Paragraph 6 of the Benefit Plan, DataComm reserved no other right to rescind or amend the Benefit Plan.

B.

On November 2, 2001, DataComm filed for relief under Chapter 11 of the Bankruptcy Code, and pursuant to Sections 1107 and 1108 of the Bankruptcy Code, DataComm continued to possess its properties and manage its businesses as debtor(s) in possession.  Thereafter, on November 19, 2001, DataComm advised the Appellees that they would be terminated on

---

> Corporation other than on behalf of the Corporation, or (iii) institutes or otherwise participates or assists in any litigation or proceedings against or on behalf of the Corporation, its officers or directors, (other than with respect to claims under this Plan or for salaries or fees owed by the Corporation for services actually rendered), or (iv) refuses to reasonably cooperate at the Corporation's expense, with the Corporation in the prosecution or defense of any litigation or proceeding, or (v) uses, communicates, publishes or otherwise transmits, in any manner whatsoever, negative comments regarding the Corporation or otherwise disparages the Corporation, its products, services, officers or directors, then, in any such event, the Board of Directors may terminate the status of such person as an Eligible Executive hereunder and all benefits hereunder for such Eligible Employee and his or her spouse shall terminate.

Benefit Plan ¶ 6.

November 30, 2001, and that the Benefit Plan would be terminated on that same date.

Ten days later, on November 29, 2001, DataComm filed its motion with the Bankruptcy Court to reject the Benefit Plan pursuant to Section 365 of the Bankruptcy Code (the "365 Motion"). A day later, on November 30, 2001, the Appellees were formally terminated. DataComm concedes that the termination was without cause. At the time of their termination, the Appellees were all over 65 years of age: Thompson was 71, Cronin was nearly 70, Smith was over 68, and Arcara was near 67.

The Appellees objected to the 365 Motion, claiming that the Benefit Plan qualified for treatment under § 1114 of the Bankruptcy Code, and that DataComm was therefore required to comply with the procedural requirements of that statute before terminating or modifying the Benefit Plan. The Bankruptcy Court conducted a hearing on April 25, 2002 to determine whether § 365 or § 1114 governed the Benefit Plan. The Bankruptcy Court held that § 1114 governed, and entered an Order denying DataComm's motion to reject the Benefit Plan. The Bankruptcy Court stated that "[i]n the event . . . [DataComm] seek[s] to terminate or otherwise modify any of the benefits of [the Appellees] provided for in the [Benefit Plan] . . . [DataComm] shall be required to first comply with the mandates and procedural requirements of 11 U.S.C. § 1114."

The District Court affirmed the decision of the Bankruptcy Court, essentially holding that the Appellees were retirees within the meaning of § 1114 because DataComm's action in terminating the Appellees the day after it purported to reject the Benefit Plan constituted a "forced retirement". This timely appeal followed.

## II.

The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157(b) and 1334. The District Court had appellate jurisdiction pursuant to 28 U.S.C. § 158(a)(1), and we have jurisdiction under 28 U.S.C. §§ 158(d) and 1291. Exercising the same standard of review as the District Court, "[w]e review the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." *In re Trans World Airlines, Inc.*, 145 F.3d 124, 130-31 (3d Cir. 1998) (citing *In re Engel*, 124 F.3d 567, 571 (3d Cir. 1997); *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1223 (3d Cir. 1995)). Inasmuch as the parties agree that there are no relevant facts in dispute, our review is limited to the legal determinations of the Bankruptcy Court as affirmed by the District Court. We will thus employ a *de novo* review of those legal determinations.III.

Section 365(a) of the Bankruptcy Code provides: "Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). (The exceptions noted in § 365 have no relevance in this case).

On the other hand, section 1114 of the Bankruptcy Code "was enacted to protect the interests of retirees of chapter 11 debtors." 7 Collier on Bankruptcy, ¶ 1114.02[1] (15th ed. 2002). That section prohibits a debtor in possession or a trustee from unilaterally modifying or terminating retirement benefits unless (1) the court orders modification or (2) the trustee and the authorized representative of the retired employees agree to

modification.  11 U.S.C. § 1114(e)(1).[5]  Prior to filing an application seeking court-imposed modification, the trustee must engage in good faith negotiations with the authorized representative of the trustee regarding the proposed modification, and must provide the authorized representative with relevant information to allow for fair evaluation of the

---

[5] 11 U.S.C. § 1114(e)(1) provides:

*Notwithstanding any other provision of this title,* the debtor in possession, or the trustee if one has been appointed under the provisions of this chapter (hereinafter in this section "trustee" shall include a debtor in possession), shall timely pay and shall not modify any *retiree benefits*, except that--

> (A) the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of such payments, pursuant to the provisions of subsections (g) and (h) of this section, or

> (B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments

after which such benefits as modified shall continue to be paid by the trustee.

(emphasis added).

-10-

proposal. *Id.* § 1114(f)(1).[6] Only after the foregoing requirements have been met, and such good-faith negotiations have occurred, is the court empowered to grant the modification motion, if, among other things, modification is necessary to permit reorganization of the debtor. *Id.* § 1114(g).[7]

---

[6] 11 U.S.C. § 1114(f)(1) provides:

Subsequent to filing a petition and prior to filing an application seeking modification of the *retiree benefits,* the trustee shall--

> (A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably . . .

(emphasis added).

[7] 11 U.S.C. § 1114(g) provides:

The court shall enter an order providing for modification in the payment of retiree benefits if the court finds that--

> (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f);

-11-

Accordingly, a debtor in possession or the trustee must continue to pay retiree benefits unless modification of such payments has been ordered by the court or the trustee and the authorized representative of the retired employees have agreed to such modification. *Id.* § 1114(e)(1).[8]

The procedural protections of § 1114 apply to "retiree benefits," which are defined with reference to the class of persons entitled to the benefits, *i.e.*, "retired employees."[9] As

---

(2) the authorized representative of the retirees has refused to accept such proposal without good cause; and

(3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities . . . ,

[8] *See* note 5 *supra* for the statutory text of § 1114(e)(1).

[9] Section 1114(a) defines "retiree benefits" as:

payments to any entity or person for the purpose of providing or reimbursing payments for *retired employees* and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title

-12-

we have indicated, the overarching question here is whether the provisions of § 1114 apply to the Benefit Plan. Stated differently, the question is whether the Appellees constitute "retired employees" for purposes of invoking the protections of the statute.

DataComm's main contention on appeal is that Appellees never retired, but rather were still employed and were terminated as employees without cause. As such, DataComm argues, the provisions of § 1114, which accord protection only to "*retired* employees," never come into play here, leaving § 365 (permitting rejection of executory contracts) as the only operative statute. We are persuaded that this contention elevates form over substance, and is thus unavailing and unacceptable.[10]

---

(emphasis added).

[10] DataComm also argues that the provisions of § 1114 do not apply here because Appellees were not retired at the time the 365 Motion [to reject DataComm's retirement Benefit Plan] was filed. As we stated, Appellees were terminated the day *after* the filing of the 365 Motion. While it is, of course, true that only retired employees can invoke the protections of § 1114, *see, e.g. In re Crafts Precision Indus., Inc.*, 244 B.R. 178, 184 (1st Cir. B.A.P. 2000) ("The legislative history of [§ 1114] clearly reveals that the statute is intended to benefit *retirees* specifically.") (emphasis added), we believe that this argument suffers from multiple flaws. First, it ignores the fact that DataComm had notified Appellees of their imminent termination prior to filing the 365 Motion. The argument, then, that the Appellees were still employed and not retired for purposes of determining the application of § 1114 we regard as specious. Such a result contravenes basic norms of fairness and undermines the purposes of § 1114, which "was enacted to protect the interests of retirees of Chapter 11 debtors." 7 Collier

-13-

Moreover, as a contractual matter, we note that DataComm cannot escape its obligations under the Benefit Plan by arguing that Appellees were terminated rather than retired. As the District Court held, "retirement was the condition precedent to the Appellees' receipt of certain benefits under the [Plan], and [DataComm] prevented the Appellees from voluntarily retiring by discharging them without cause." The Benefit Plan explicitly and unambiguously states that only the particular proscribed actions by an Eligible Executive could result in the justifiable forfeiture of retirees' benefits. We

on Bankruptcy, ¶ 1114.02[1] (15th ed. 2002).

Second, it rests upon a faulty premise. DataComm's contention here is that the relevant date for determining the applicability of § 1114 is the date when the rejection of the Plan would have become effective, which in this case would be either the date immediately prior to the petition date, November 2, 2001, or, at the very latest, the filing date of the 365 Motion, November 29, 2001. This contention fails for a few reasons. Even assuming, without deciding, that the rejection of an executory contract under § 365(a) becomes effective upon the filing of the motion, *but see In re Thinking Machines Corp.*, 67 F.3d 1021, 1028 (1st Cir. 1995) ("[W]e hold that a rejection of a nonresidential lease under section 365(a) becomes legally effective only after judicial approval has been obtained."), that merely begs the question of whether § 365 governs the Benefit Plan in the first place. If, as Appellees maintain, § 1114 applies, then DataComm's 365 Motion was ineffective, and the decisive date of any rejection, however defined, could not occur until after the requirements of § 1114 have been satisfied.

Accordingly, we reject DataComm's contention that Appellees were still employed, rather than retired, albeit involuntarily, at the filing of the 365 Motion and therefore outside the protective ambit of § 1114.

-14-

believe that the District Court's reasoning was sound here – the intent of both DataComm and the Appellees was that the Appellees would receive the retirement benefits of the Plan unless they were terminated for cause. They were not. *See* 13 Williston on Contracts § 39:3 (4th ed.) ("Where a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform. . . .").

Section 365, when it applies, allows DataComm to terminate executory contracts, with the bankruptcy court's approval, notwithstanding any contractual obligations thereunder. *See, e.g., In re Spectrum Info. Techs., Inc.*, 190 B.R. 741, 745-46 (Bankr. E.D.N.Y. 1996). At issue then, is whether Congress intended the term "retired employees" in § 1114 to encompass the concept of "forced retirement."

In contending that "forced retirement" does not implicate the provisions of §1114, DataComm relies heavily on a *reductio ad absurdum*. According to DataComm, the District Court's holding, taken to its logical conclusion, means that § 1114 would apply to a retirement health benefit when DataComm discharged an employee without cause at the age of 25.

Recognizing that the employees affected here were all over the age of 65 (Arcara 66; Smith 68; Cronin 70; Thompson 71), and were purposefully discharged only one day after DataComm filed its 365 Motion, we can only conclude that DataComm's action was taken deliberately and was designed to thwart the purposes of § 1114. Therefore, accepting the concept of "forced retirement" does not and cannot lead to the absurd result posited by DataComm that an employee could be retired at age 25 if discharged without cause. The contours of such a concept as "forced retirement" may receive appropriate

-15-

interpretation, when it occurs, by a case-by-case development. What matters here is that the particular facts of this case are compelling enough to warrant the application of such a concept.

As the record reflects, the Appellees were on the verge of retirement,[11] receiving a minimal paycheck for "basically hanging around." Tr. of Bankr. Hearing at 27. They were founders and long-term senior executives of DataComm, and each was of retirement age and was qualified to warrant entitlement to the benefits prescribed by DataComm's Benefit Plan, which was designed to compensate *long-term* senior level employees. *See* Benefit Plan ¶ 2a. As such, our holding in no way countenances the 25 year old "horrible" scenario envisaged by DataComm.

Under the circumstances presented here, to allow DataComm to deliberately interfere with Appellees' retirement benefits would operate to frustrate and nullify the objectives of § 1114, which, as we have stated, was "enacted to protect the interests of retirees of Chapter 11 debtors." 7 Collier on Bankruptcy, ¶ 1114.02[1] (15th ed. 2002).

IV.

We address one final issue – an issue not raised or initially briefed by the parties. At oral argument, we asked the question whether the Benefit Plan was an executory contract for purposes of § 365 (which involves *only contracts* that are executory in substance and which are not "trumped" by § 1114) and so could be considered by the Bankruptcy Court for

---

[11] We note that under the Employee Retirement Income Security Act of 1974, the age of "[n]ormal retirement" is sixty-five. *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 281 n.3 (3d Cir. 1988) (citing 29 U.S.C. § 1002(24)).

-16-

rejection on an appropriate application. If the Benefit Plan *was not executory*, § 365 would have no application as it could not be rejected under that section. We requested supplemental briefing on the question. After reviewing the parties' submissions, we are satisfied that the Benefit Plan is indeed an executory contract.

We set forth the controlling definition of "executory contract" in *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36 (3d Cir. 1989): "[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Id*. at 39 (citations and internal quotations omitted).

The crucial issue for determining whether the instant Benefit Plan was executory is whether the *Appellees* had *material* obligations that remain unperformed at the time the bankruptcy petition was filed. *See In re Columbia Gas System Inc.*, 50 F.3d 233, 240 (3d Cir. 1995) ("The time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed.") (citations omitted). Thus, our focus is on the restrictive covenant obligations of the Appellees, *i.e.*, their obligations, set forth in Paragraph 6 of the Benefit Plan (see note 4 *supra*). Paragraph 6, among other things, requires Eligible Executives: to not compete; to maintain confidentiality; to refrain from instituting litigation; to agree to participate in litigation initiated by Datacomm; and to refrain from negative publicity.

While we have held that the determination of what constitutes a material breach under the *Sharon Steel* definition is governed by relevant state law, *In re Columbia Gas System Inc.*, 50 F.3d at 240 n.10, we need not look beyond the Benefit

Plan itself to make that determination. The Benefit Plan expressly defines certain acts or events as constituting material breaches of the contract. It states that:

> [i]n the event in the sole judgment of the Board of Directors of the Corporation, an Eligible Executive or his spouse directly or indirectly [fails to comply with any of the covenants set forth in Paragraph 6], then, in any such event, the Board of Directors may terminate the status of such person as an Eligible Executive hereunder and all benefits hereunder for such Eligible Employee and his or her spouse shall terminate.

Benefit Plan ¶ 6 and note 4 *supra*.[12] Thus, if an Eligible

---

[12] Our dissenting colleague has discussed the issue of "materiality" at length, but he has made no reference to the very terms of the Benefit Plan itself. It is that Plan, as we have stated, which defines the "materiality" of the Appellees' obligations – it explicitly provides that the failure of an Eligible Executive to comply with the covenants of Paragraph 6 excuses the future performance of DataComm. We are satisfied that the parties intended the provisions of Paragraph 6 to be material. No further analysis is therefore required. As such, the dissenting opinion's analysis, while perhaps thorough, substitutes its own views on materiality for what the parties explicitly and formally agreed to as being "material" and vital to their contract.

We also find the dissent's reliance on *In re Columbia Gas Sys., Inc.*, 50 F.3d 233 (3d Cir. 1995), to be misplaced. That case stands for the proposition that where the remaining obligations in a contract are mere conditions, not duties, a contract cannot be considered executory for purposes of § 365. The distinction between conditions and duties, essential to the

Executive breached one of those provisions, it would excuse the future performance of DataComm. By contractual definition, therefore, such obligations are material. *See generally* Restatement (Second) of Contracts § 237 (1981) (uncured material breach by one party discharges other party's duty under contract); *see also* 23 Williston on Contracts § 63:3 (4th ed.) ("Where the contract itself is clear in making a certain event a material breach of that contract, a court must ordinarily respect that contractual provision."). We are thus satisfied that the Appellees' obligations are material, and that the Benefit Plan is an executory contract.

V.

We conclude that deliberate and involuntary termination of an employee on the verge of retirement, where the employee has otherwise met all qualifications for retirement, cannot deprive such an employee of the procedural protections of § 1114. We therefore hold that the DataComm Appellees are "retired employees" within the meaning of § 1114. This being so, DataComm's Benefit Plan providing retirement benefits to such employees was an executory agreement and could not be rejected pursuant to § 365. Accordingly, we will affirm the judgment of the District Court in favor of the Appellees.[13]

_____

holding in *In re Columbia Gas Sys.,* is simply inapposite here.

[13] DataComm raises an additional issue for the first time on appeal – whether § 1114 applies to the Long Term Care Benefits in particular and, if it does not, whether DataComm can sever them for purposes of proceeding under § 365. DataComm's position is that the Long Term Care Benefits did not qualify as "retiree benefits" since they were payable during Appellees' employment. DataComm offers no exceptional circumstances to excuse its failure to raise this argument in the

-19-

Pollak, J., *concurring*

I concur in the court's judgment in all but one small particular. But I do not join the court's opinion.

I arrive at substantially the same end-point as the court – i.e., I agree with the court that the Bankruptcy Court and the District Court were right in disallowing DataComm's proposed rejection of appellees' Benefit Plan. But I arrive at the same

Bankruptcy Court and the District Court. *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 142 (3d Cir. 2001) ("Generally, barring exceptional circumstances, like an intervening change in the law or the lack of representation by an attorney, this Court does not review issues raised for the first time at the appellate level.") (citations omitted); *Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001) ("[A]rguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible of review in this Court absent exceptional circumstances (e.g., the public interest requires that the issues be heard or manifest injustice would result from the failure to consider such issues).") (citations omitted). Indeed, it appears that DataComm became aware of the argument only after the District Court alluded to the legal issue in its order affirming the Bankruptcy Court. Although DataComm's Reply Brief claims that the District Court held that § 1114 is not applicable to the Long Term Care Benefits contained in Paragraph 3 of the Benefit Plan, it appears that DataComm has misstated the District Court's action. In fact, the District Court, in footnote 8 of its unpublished opinion, stated that it would not address the issue because it had not been raised by DataComm. We, too, express no opinion on this matter, as it has clearly been waived.

-20-

destination via a different route: I do not agree with the court that 11 U.S.C. § 1114 protects the appellees from DataComm's intended unilateral rejection of the Benefit Plan; in my view, appellees are not protected by § 1114 because they were not "retired employees" – the category of persons sheltered by § 1114 – at the time DataComm undertook to terminate the Benefit Plan. However, I conclude that DataComm could not reject the Benefit Plan pursuant to 11 U.S.C. § 365, because that provision authorizes rejection of an "executory contract" and, in my view, the Benefit Plan was not an executory contract.

I.

The court affirms that portion of the Bankruptcy Court order requiring DataComm to abide by the provisions of 11 U.S.C. § 1114, which provides procedural safeguards against modification of benefits for "retired employees." Adverting to the purpose of § 1114, which was "enacted to protect the interests of retirees of Chapter 11 debtors," 7 Collier on Bankruptcy, ¶ 1114.02[1] (15th ed. 2002), and pointing to appellees' termination without cause, the court holds that appellees ought to be considered retirees within the meaning of § 1114. The court's argument in favor of treating appellees as, in effect, constructive "retirees" cannot fail to strike a sympathetic chord. Nonetheless, I am not persuaded that appellees can properly be deemed as coming within the category of individuals protected by the statute.

Section 1114 is entitled, "Payment of insurance benefits to *retired employees*," *id.* (emphasis added), signifying that it is the status of the employee, and not the nature of the benefit, that determines the scope of § 1114. The wording of § 1114 cannot be said to give definitive guidance on whether, to claim § 1114's protections, employees must have retired by the date that their employer files for bankruptcy or, alternatively, whether they

must have retired by the date upon which the debtor seeks to terminate retiree benefits.[14] The relevant point for purposes of

---

[14]Some of the statutory language can be said to support the view that the drafters had in mind scenarios in which, after filing for bankruptcy, an employer undertakes to reduce, or entirely abrogate, benefits of employees who had retired *prior* to the bankruptcy filing. Thus, § 1114(l) provides:

> This section shall not apply to any retiree, or the spouse or dependents of such retiree, if such retiree's gross income *for the twelve months preceding the filing of the bankruptcy petition* equals or exceeds $ 250,000, unless such retiree can demonstrate to the satisfaction of the court that he is unable to obtain health, medical, life, and disability coverage for himself, his spouse, and his dependents who would otherwise be covered by the employer's insurance plan, comparable to the coverage provided by the employer *on the day before the filing of a petition under this title*.

11 U.S.C. § 1114(l) (emphasis added). A similar perspective is to be found in the legislative history; see Senate Report 100-119's statement that the "bill requires that such benefits, *provided to retired employees*, their spouses and dependents pursuant to a plan in effect at the time of [sic] a Chapter 11 proceeding is commenced, will *continue to be paid* when the employer *providing* those benefits files ... a petition under Chapter 11 of the Bankruptcy Code, until or unless a modification is agreed to by the parties or ordered by the court." S. Rep. No. 100-119, at 3 (1988), *reprinted in* 1988 U.S.C.C.A.N. 683, 685 (May 26, 1988) (emphasis added).

On the other hand, it is not clearly apparent that Congress would have had any policy reason to exclude from the protection of § 1114 employees who had retired after the debtor-employer

this appeal, however, is that appellees had not retired by either date: appellees were employees of DataComm when DataComm filed under Chapter 11, and they remained employees until they were dismissed one day *after* DataComm filed its 365 motion seeking to terminate the Benefit Plan.

To be sure, the court does not argue that appellees had in fact retired by either date. Instead, it adopts the District Court's argument, which relies on the prevention doctrine, and concludes that appellees are constructive retirees who ought thus to receive § 1114's protections. The prevention doctrine states that "[i]t is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." 5 Williston, Contracts 677, at 224 (3d ed. 1961); *see also Apalucci v. Agora Syndicate*, 145 F.3d 630, 634 (3d Cir. 1998) ("when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure."). The court argues that, since retirement was the condition precedent to receipt of benefits, and since DataComm willfully thwarted fulfillment of this condition when it dismissed appellees (who were at or near retirement age) on the day after DataComm filed its 365 Motion, appellees ought to be considered "retirees" within the meaning of § 1114.

While the pedigree and wisdom of the prevention doctrine are unquestionable, the conclusion that the court draws from it – namely, that § 1114 ought to extend to appellees – is unwarranted. The prevention doctrine entails that, where one party to a contract takes an action that prevents the other party

---

filed for bankruptcy but before it moved to jettison its retirement-benefits liabilities.

from being able to fulfill a condition precedent to that contract, the first party may not use its own action as a mechanism for avoiding performance of its contractual obligations. The prevention doctrine does not entail that, as a result of the first party's culpable obstruction, that party is not entitled to avoid performance of its obligations for *any* reason. There may well be reasons other than the failure of the condition precedent that would allow the first party to withdraw permissibly from the duties it contracted to perform.

Applying the prevention doctrine here signifies that DataComm could not use the fact that appellees had not retired as a ground for withdrawing from its obligation to pay retiree benefits, since DataComm, by firing appellees, prevented them from retiring on the day of their dismissal or at any subsequent time. On the basis of the prevention doctrine, then, the Benefit Plan remained in place despite appellees' non-retirement. But there might have been other reasons lending support for DataComm's asserted entitlement to withdraw. (Indeed, DataComm claims that § 365 provides one such reason.) Thus, the prevention doctrine does not lead to the conclusion that appellees are (or ought to be treated as) retirees or the conclusion that § 1114 ought to apply to appellees. The prevention doctrine can do no more than return the parties to the situation that existed prior to appellees' dismissal. Since, for the reasons advanced above, that situation cannot be characterized as one in which appellees had retired, the prevention doctrine does not afford appellees the protections of § 1114.

In sum, § 1114 applies only if the beneficiaries of the agreement in question have retired before their employer seeks to terminate or otherwise modify that agreement. Since that is not the situation here, I conclude that § 1114 is inapplicable.

II.

The court finds that § 1114 applies to appellees and trumps 11 U.S.C. § 365. Accordingly, the court holds that the protections conferred by § 1114 prohibit rejection of the Benefit Plan pursuant to § 365, and require compliance with the terms of § 1114 prior to any modification of the Plan. I agree that DataComm may not reject the Benefit Plan, but I rest this conclusion on the ground that the Benefit Plan was not an "executory contract," and hence fell outside the coverage of § 365.[15]

An executory contract is "'a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.'" *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir. 1989) (citing V. Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 460 (1973)). Thus, for purposes of ascertaining the nature of the Benefit Plan, the relevant question is whether the obligations enumerated in Paragraph 6 of the Plan, which requires that the Plan's beneficiaries forbear from competing with or disparaging the company, are *material*.

State law determines whether breach of a contract provision is material. *See, e.g.*, *Fineman v. Armstrong World Indus.*, 980 F.2d 171 (3d Cir. 1992). Delaware, where the underlying dispute arose, incorporates the test of materiality found in the Restatement. *See BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003); *SLMsoft.com, Inc. v. Cross Country Bank*, 2003 Del. Super.

---

[15]*See* 11 U.S.C. § 365 ("[T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.").

LEXIS 112, 51-52 (Del. Super. Ct. 2003). To define "materiality," the Restatement provides a list of "circumstances" deemed to be "significant" in an assessment of "whether a failure to render or to offer performance is material," Restatement (Second) of Contracts § 241:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. *Id*.

Taking these circumstances one by one, I conclude that the balance of considerations lies on the side of non-materiality:

a) *Benefit reasonably expected from the agreement*: While DataComm likely expected adherence to the restrictions encompassed in Paragraph 6, it would have harbored this

-26-

expectation prior to and independent of the Benefit Plan. Some of the obligations contained in this Paragraph simply incorporate prior agreements – for example, the confidentiality agreements in clause (ii)[16] – and it would be these earlier agreements that justified the expectation. Other obligations are so intertwined with the executives' pre-existing duties of good faith and loyalty – e.g., forbearance from investing in a competitor (clause (i)) or disparaging the company (clause (iii)) – that, here too, DataComm's expectation would not have been rooted in the Benefits Plan. In sum, since DataComm would have received the benefit flowing from appellees' performance of these obligations independent of the Benefit Plan, it does not make sense to consider that performance a benefit that DataComm reasonably expected from the agreement. Or, to put the point in the terms the Restatement uses, performance of the obligations was not a benefit *of* the agreement.

b) *Adequacy of Compensation*: The Restatement states that "[t]he second circumstance, the extent to which the injured party can be adequately compensated for his loss of benefit (Subsection (b)), is a corollary of the first." § 241 cmt. c. For the reasons set forth in the previous paragraph, then, this circumstance also does not support a finding of materiality.

c) *Forfeiture*: The Benefit Plan permits DataComm to terminate the Plan's benefits in the face of an eligible executive's breach of Paragraph 6; it does not state that termination will automatically follow. The fact that an executive could fail to comply with one of the restrictions in Paragraph 6 and still continue to receive the benefits package further supports a finding that the restrictions are not material.

_____

[16]Clause (ii) of Paragraph 6 references "violat[ions] of any confidentiality or similar agreements with the Corporation ..."

d) *Likelihood of cure*: In describing this circumstance, the Restatement states that "[t]he fact that the injured party already has some security for the other party's performance argues against a determination that the failure is material." § 241 cmt. e. Here, DataComm would have had some security for the executives' adherence to Paragraph 6: Again, some of the obligations contained there (e.g., obligations of confidentiality) hinge upon prior agreements, breach of which may entail penalties rooted in those agreements. Similarly, legal sanctions for breach of the duty of loyalty would motivate adherence to some of the other restrictions (e.g., those against competition and disparagement).

e) *Good faith and fair dealing*: The Restatement states that "[a]dherence to the standards stated in Subsection (e) is not conclusive, since other circumstances may cause a failure to be material in spite of such adherence. Nor is non-adherence conclusive, and other circumstances may cause a failure not to be material in spite of such non-adherence." § 241 cmt. f. In other words, this is a less probative consideration than the others. In the absence of an actual breach of Paragraph 6 by any of the appellees, the implications of this consideration for the materiality of the appellees' obligations would be purely speculative.

In sum, the circumstances supporting a finding of materiality do not appear to be present here.

More generally, we can distill from the Restatement's list the defining feature of materiality – *viz.*, the connection between materiality and consideration. More to the point, the Restatement will deem one party's obligation material where it serves as consideration for the other party's promised performance. *Compare Frank Felix Assocs. v. Austin Drugs*, 111 F.3d 284, 289 (2d Cir. 1997) ("Under New York law, for a

-28-

breach of a contract to be material, it must go to the root of the agreement between the parties.") (citation omitted). Thus, the first element of § 241 of the Restatement is "the extent to which the injured party will be deprived of the benefit which he reasonably expected," and "the benefit which he reasonably expected" is the consideration that the contract provides, § 241; *see also* § 241 cmt. b ("Since the purpose of the rules stated in §§ 237 and 238 is to secure the parties' expectation of an exchange of performances, an important circumstance in determining whether a failure is material is the extent to which the injured party will be deprived of the benefit which he reasonably expected from the exchange (Subsection (a)). If the *consideration* given by either party consists partly of some performance and only partly of a promise (see Comment *a* to § 232), regard must be had to the entire exchange, including that performance, in applying this criterion.") (emphasis added); § 81 ("In most commercial bargains the consideration is the object of the promisor's desire and that desire is a material motive or cause inducing the making of the promise, and the reciprocal desire of the promisee for the making of the promise similarly induces the furnishing of the consideration."). *Cf. id.* at § 162 cmt. c. ("a misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent ... [or] if the maker knows that for some special reason it is likely to induce the particular recipient to manifest his assent."). Indeed, the Reporter's notes to the chapter of the Restatement containing §241 explain that the term "failure of performance," when used in that chapter, *see, e.g.*, id. at §237,[17] replace the term "failure

---

[17]Section 237 qualifies the phrase "failure of performance" with the word "material." *See id.* ("it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured *material failure* by the other party *to render any such performance* due at an earlier time.") (emphasis

of consideration." *See* Restat. (2d) Contracts, ch. 10, Introductory Note. In sum, a party's obligation to perform or forbear will be material if it functioned as consideration, or as the reason inducing the other party's entry into the contract.

It seems improbable that the obligations contained in Paragraph 6 functioned in some significant way as consideration for the benefits conferred by the Benefit Plan. The appellees' obligations are set forth in the Benefit Plan in a manner that appears to make them subsidiary to the Plan's central purpose. More specifically, the bulk of this eight-paragraph contract is devoted to setting forth DataComm's obligations (Paragraphs 3, 4 and 7), describing the benefits that the eligible executives will receive (Paragraphs 3 and 4), and specifying the protections available to these executives in the event that DataComm undergoes a change in control (Paragraph 5).[18] Paragraph 6 is the only paragraph addressing the executives' obligations; it sets forth a list of restrictions on the eligible executives' conduct, but it does so by embedding this list within a provision stating that DataComm may terminate the benefits of an executive who fails to fulfill one of these obligations. This placement of appellees' obligations suggests that appellees' forbearance is not what

---

added). Section 241 also pertains to material failures of performance (i.e., what were formerly referred to as "failures of consideration"), although its language is somewhat more elaborate. *See* § 241 (describing "whether a failure to render or to offer performance is material.").

[18]The remaining paragraphs specify the names of the eligible executives (Paragraph 1), define terms used in the Plan (Paragraph 2), permit DataComm to terminate an executive's benefits in the event that he violates a restriction described in the Agreement (Paragraph 6), and provide for the severability of any provision deemed unenforceable (Paragraph 8).

motivates or compensates DataComm's performance. Instead, the Plan memorialized a promise by DataComm to furnish its long-standing executives with certain benefits.

Indeed, the Plan's preamble amply supports this reading, as it contains language signifying that the purpose of the Plan is to compensate appellees for their past years of service to DataComm. *See* App. at 44 ("WHEREAS, the Corporation desires to provide to certain of its employees (the "Eligible Executives") with [sic] certain additional benefits *based upon their many years of service to the Corporation*") (emphasis added). The preamble makes no mention of an intent to secure appellees' compliance with the restrictive provisions of Paragraph 6, or to otherwise bind appellees in any way. The real crux of the agreement, then, is a commitment undertaken by DataComm to reward appellees' for past consideration.

Finally, Third Circuit precedent further supports a finding that the obligations set forth in Paragraph 6 are not material. In *Enterprise Energy Corp. v. United States (In re Columbia Gas Sys.)*, 50 F.3d 233 (3d Cir. 1995), this court appealed to the Restatement to evaluate materiality:

> In order to determine the materiality of the class members' obligations, we turn first to basic contract principles. There is a distinction in the law between failure of a condition and a breach of a duty: 'Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur.' Restatement (Second) of Contracts § 225(3) (1981). This distinction between a condition and a duty (or promise) is important here. The Restatement makes clear that while 'a contracting party's failure to fulfill a condition excuses performance by the other party

whose performance is so conditioned, it is not, without an independent promise to perform the condition, a breach of contract subjecting the nonfulfilling party to liability for damages.' *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106, 460 N.E.2d 1077, 1081-82, 472 N.Y.S.2d 592 (N.Y. 1984) (citing Restatement (Second) of Contracts § 225).

50 F.3d at 241 (footnotes omitted).[19] *Columbia Gas* greatly clarifies the nature of appellees' obligations under the Benefit Plan. Paragraph 6 permits DataComm to terminate an executive's benefits should that executive have been found to have violated one of the listed restrictions. In other words, a breach by one of the appellees would excuse continued performance by DataComm. However, such a breach would not, by itself,[20] subject the "nonfulfilling" executive to liability for damages. Accordingly, the appellees' obligations should be seen as conditions, and not duties. And, "if the remaining obligations in the contract are mere conditions, not duties, then the contract cannot be executory for purposes of § 365 because no material breach could occur." *Id.* at 241.

For the foregoing reasons, I conclude that the Benefit

_____

[19]As the *Columbia* court noted, "[t]he Restatement has dropped the term 'condition precedent' in favor of simply stating it as 'condition.' E. Allen Farnsworth, 2 Farnsworth on Contracts § 8.2, at 349 (1990)." 50 F.3d at 241 n. 15.

[20]The confidentiality agreements cited in the Plan or the doctrine of loyalty might have subjected an executive who breached his duty of confidentiality or loyalty to liability, but this consequence would have emerged from a legal relationship that existed independent of the relationship forged by the Plan.

Plan was not executory. Since section 365 permits rejection only of those contracts that are executory, I would affirm denial of appellants' 365 Motion on the ground that section 365 does not apply to the contract at issue. Accordingly, I concur in the judgment of the court, subject to the small reservation noted in footnote 1, *supra*.